USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 24, 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SBIW, INC.,

                Plaintiff,

    - against -

GENERAL ELECTRIC COMPANY,

                Defendant.

**MEMORANDUM
OPINION & ORDER**

10 Civ. 7812 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff SBIW, Inc. and Defendant General Electric Company ("GE") entered into a contract in which SBIW was to refurbish a hydroelectric turbine generator owned by Southern California Edison ("SCE") for GE. SBIW contends that after its performance under the contract was substantially complete, GE terminated the contract in bad faith, and refused to pay SBIW what it is owed under the contract. SBIW also claims that GE converted its proprietary and confidential materials by providing these materials to a third party hired to complete the turbine overhaul project. SBIW seeks $1,096.998.49 in damages on its breach of contract claim, and $5 million in damages on its conversion claim.

        GE has moved for summary judgment. (Dkt. No. 32) For the reasons stated below, GE's motion will be granted in part and denied in part.

## BACKGROUND

### I.    FACTUAL BACKGROUND

        On August 14, 2009, SCE and GE entered into a contract (the "GE/SCE Purchase Order") in which GE agreed to refurbish SCE's hydrostatic turbine generator known as Big

Creek 3, Unit 1, located in Auberry, California.  (Def. R. 56.1 Stmt. ¶ 1[1]; Mann Aff. ¶¶ 2-3 &

Ex. 1 (GE/SCE Purchase Order))  The GE/SCE Purchase Order states that GE is being retained

to:

> [p]rovide necessary supervision, labor, [m]aterial, tools and equipment to perform a mechanical overhaul and provide replacement stator core, installation for the core, stator winding, spare coils and winding materials, and installation of the winding at Edison's Big Creek Powerhouse 3 Unit No.1 as requested by the Engineering and Technical Services Section of the Southern California Edison Company Power Production Department.

(Purchase Order at 2)  "Specification No. BC PH3-1 4-10-09" (the "Specification") –

incorporated by reference in the GE/SCE Purchase Order – states that the turbine is a "Francis

type turbine" of "1920's vintage" that "has not undergone a major overhaul in 20-30 years."

(Purchase Order at 2; Bouchard Aff., Ex. 1 (Specification) at 2-1 to 2-2)  The Specification notes

that "[t]he unit has been out of service since December 2008 when it suffered an electrical fault

which resulted in a fire and other damage to the generator."  (Specification at 2-1)  The

Specification further states that "[i]t is [SCE's] intent [that this] major overhaul [will] return the

unit back to service in a like new condition."  (Id. at 2-1)

      The GE/SCE Purchase Order provides for two types of refurbishment work:  (1)

"STATOR CORE AND STATOR CORE WINDING" and (2) "TURBINE MECHANICAL

WORK."  (Def. R. 56.1 Stmt. ¶ 1; GE/SCE Purchase Order at 4-5)  The Specification, which

governs the "TURBINE MECHANICAL WORK," states that such work "generally consists of

disassembly, verifying fits, location marks, dimensions, clearances, inspections,

recommendations for repair, repairs, replacements and reassembly of the turbine."  (Specification

---

[1]  To the extent that this Court relies on facts drawn from Local Rule 56.1 statements, it does so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)).

at 2-2)  The GE/SCE Purchase Order provides that all work will be completed by the "[w]ork completion date of 3/13/2010." (Def. R. 56.1 Stmt. ¶ 2; GE/SCE Purchase Order at 6)

In May 2009, GE invited SBIW to bid to be the subcontractor on the portion of the contract dealing with the turbine mechanical work.  (Bouchard Aff. ¶¶ 5-6)  On August 11, 2009, SBIW submitted Proposal 09-009 Revision 01 (the "Proposal") to GE.  (Def. R. 56.1 Stmt. ¶ 4; Bouchard Aff. ¶ 7; Mann Aff., Ex. 3 (Proposal))  The Proposal provides that SBIW will refurbish the turbine as outlined in the Specification for a lump sum price of $1,639,255.[2]  (Def. R. 56.1 Stmt. ¶ 7; Proposal at GE_SBIW-02248)  According to the Proposal, SBIW was to disassemble the turbine, refurbish it at an SBIW shop off-site, and then reassemble the turbine at its original location.  (Def. R. 56.1 Stmt. ¶ 5)  The Proposal specifies a "machining tolerance[]" of 0.001"/ft for the "Flatness[,] Parallelism[,] and Perpendicularity" of the turbine's surfaces. (Proposal at GE_SBIW-02256)  Article C.6 of the Proposal provides for a "work completion schedule" of 210 days, and states that

> [t]he Work completion schedule provided in this article C.6 is the guaranteed
> duration required to achieve the Work Completion date as defined in article 2.11
> of the General Terms and Conditions SCE – III FPA 03/02/09.

(Proposal at GE_SBIW-02253)  The attached "Proposal Schedule" indicates that SBIW will work 6 days a week and 10 hours per day on the project.  (Id. at GE_SBIW-02294)  The Proposal Schedule contemplated that GE would issue a notice to proceed on August 3, 2009, and that SBIW's work would be completed by March 1, 2010.  (Id. at GE_SBIW-02294 to 02300)

After a negotiation between Serge Bouchard, SBIW's president, and Michael Mann, a Senior Service Manager at G.E. Energy, the Proposal was incorporated into a Standard

---

[2]  The Proposal lists the bid price as $1,639,255, but then spells out this figure as "Sixty Seven Thousand Eight Hundred Dollars."  Both sides agree that SBIW's bid price was $1,639,255. (See Def. R. 56.1 Stmt. ¶ 7; Bouchard Aff. ¶ 8)

Service Agreement ("SSA") that was executed by SBIW on August 31, 2009, and executed by GE on September 2, 2009. [3]  (Def. R. 56.1 Stmt. ¶¶ 3-4; Bouchard Aff., ¶¶ 14-26, & Ex. 13 (SSA) at 9; id. Ex. 14 at 2 (GE signature pages))  The SSA contemplates that the parties will be bound by GE purchase orders that divide the necessary work into discrete tasks, and that would be the subject of SBIW invoices once the work was completed.  (See Def. R. 56.1 Stmt. ¶ 11; SSA ¶ 1 (noting that Defendant would have "no . . . financial obligation . . . without issuance of a Purchase Order," and that purchase orders "shall be deemed incorporated into and governed by the terms of this SSA"); Mann Aff., Ex. 4 (purchase orders))  The SSA reflects Plaintiff's requested payment terms of "2.5% 15 net 90 days" – meaning that full payment would be due 90 days after an invoice was issued on a purchase order, but a discount of 2.5% would be applied if payment was made within 15 days after issuance of an invoice.  (Bouchard Aff. ¶ 23; SSA ¶ 4)  The SSA indicates that "time is of the essence" (Mann Aff. ¶ 12; SSA ¶ 13(e)), and provides for a termination date of September 1, 2010.  (SSA ¶ 2)

The SSA permits SBIW to request extensions of time if its work is delayed by change orders.  (See SSA ¶ 1) ("If any changes cause an increase or decrease in the cost of, or the time required for the performance of, any work under the [SSA], . . . [a]ny Seller claim for an adjustment must be asserted within ten (10) days of Seller's receipt of the change notification, and must be approved in a written amendment ("Change Order").).  Each purchase order also states – in very small print – that "[a]ny Seller claim for adjustment [of a purchase order] will be deemed waived unless asserted within thirty (30) days from Seller's receipt of the change or suspension notification, and may only include reasonable, direct costs that will necessarily be incurred as a direct result of the change."  (Mann Aff., Ex. 4, Cl. 6, at GE_SBIW-02341)

---

[3]  The SSA refers to SBIW as "Seller" and GE as "Buyer."  (Def. R. 56.1 Stmt. ¶ 3; Bouchard Aff., ¶¶ 14-26, & Ex. 13 (SSA))

On September 22, 2009, SBIW began work on the project site.  (Bouchard Aff. ¶ 27)  The next day, Bouchard emailed a revised work schedule to Brian Mackey, a G.E. Field Engineer, reflecting the fact that SBIW began work on the project on September 22, 2009, rather than on August 12, 2009, as had been contemplated in the Proposal.  (Id. ¶ 27 & Ex. 15)  The revised work schedule provided that SBIW would finish its work by March 10, 2010.  (Id., Ex. 15)  Between September 22, 2009, and February 1, 2010, SBIW worked on refurbishing the turbine pursuant to the SSA, and the parties communicated from time to time regarding certain additional work that needed to be performed.  (Id. ¶ 28; Ex. 16 (Letters from Bouchard to Mackey concerning proposals for additional work on the project))

On February 11, 2010, Bouchard sent an email to Mackey proposing "revised dates [for completion of the project] taking in[to] consideration the change orders that have been issued to date."  (Id., Ex. 19, at 1)  The attached "contractual schedule" provided that SBIW's work would be completed by June 9, 2010.  (Id., Ex. 19, at 5)  There is no evidence that GE agreed to this new proposed schedule.

SBIW asserts that on February 17, 2010, SCE issued a design change to SBIW that required the turbine's "patch bolts to be welded using full penetration seal welding," according to SCE's "weld preparation pre-heat welding procedure."  (Id. ¶ 32; see id., Ex. 20 (drawing of the procedure))  Application of SCE's welding procedure proved to be problematic. A March 7, 2010 "Weekly Work Report" cites damage caused by utilizing SCE's welding process, including that the turbine's "lower line plate is badly warped d[ue] to the welding of the patch bolt heads[,] an[d] (2) the headcover is severely distorted."  (Id., Ex. 21 (March 7, 2010 Weekly Work Report), at 1)  SBIW asserts that these problems were caused by SCE's "clearly

improper" welding procedures, which forced SBIW "to remove these faulty welds and devise a new welding procedure for the patch bolts."  (Id. ¶ 34)

> SBIW states that

> these changes in design and the improper weld procedure by SCE caused SBIW to experience delays in welding of the patch bolts, and caused further delays in the in-place machining work.  These erroneous design changes and weld procedure also amplified the problems SBIW later experienced in being able to obtain consistent alignment measurements and prevented SBIW from meeting its contractual tolerance of 0.001"/ft for the plumb and alignment of the wicket gate bores for the line boring work.

(Bouchard Aff. ¶ 35)

> On March 11, 2010, Marc Aoun, a GE project manager, sent Bouchard the following letter "summariz[ing] GE's position" after a conference call earlier that day between the parties concerning work delays:

> This letter is to summarize GE's position as discussed today in our conference call with Mr. Michael Mann, Brian Mackey, myself and you, with regards to the delays SBIW has been and is currently experience and causing to the ongoing work related to the [Big Creek] project.

> We have reiterated today the position Mr. Mann and I expressed to you last month:  the work at SCE's Big Creek Powerhouse 3 on Unit 1 within the current project must be completed, and the unit must be returned to proper operation[,] on or before May 31st 2010.

> As stated previously and today, the delays currently experienced on this project due to SBIW issues are causing coordination problems as well as direct delays to other work being accomplished or planned by GE on this project.  GE's and SBIW's reputations with SCE are suffering greatly.  Additionally GE expects to suffer financial penalties if the above deadline is not met; penalties which would not have been enforced by SCE if the deadline is met.

> As such, we understand that you have today agreed to execute the remaining work with the necessary resources, over two shifts for the remainder of the project, in order to achieve completion and return the machine to proper production and to SCE on May 31st 2010 at the latest.

> We also expect to be informed daily of the progress, of any issues that may arise and of your plan to counteract those issues in order to meet the above deadline.

Thank you.

(Mann Aff., Ex. 5 (Mar. 11, 2010 Ltr.)) (emphasis added)

Bouchard conceded at his deposition that GE's March 11 letter accurately reflects

SBIW's agreement to complete its work on the Big Creek project by May 31, 2010:

> Q.  Now this letter on March 11th, 2010 says "We understand that you have today agreed to execute the remaining work with the necessary resources over two shifts for the remainder of the project, in order to achieve completion and return the machine to proper production and to SCE on May 31st, 2010, at the latest."  Is that an accurate statement?
>
> A.  Yes
>
> Q.  Had you at that point in time agreed to execute the remaining work with the necessary resources over two shifts for the remainder of the project, in order to achieve completion and return the machine to proper production and to SCE on May 31st, 2010 at the latest?
>
> A.  Yes.

(Def. R. 56.1 Stmt., Ex. A (Bouchard Dep.) at 242-43)[4]  SBIW acknowledges, however, that

"work at the project was not complete as of [May 31, 2010]."  (Pltf. Resp. to Def. R. 56.1 Stmt. ¶

21; see also Bouchard Dep. at 243 ("Q.  Was that accomplished?  Did you get the work done by

May 31st?  A.  No."))

On May 23, 2010, Bouchard sent an email to GE project manager Aoun and GE

senior service manager Mann stating that SBIW had encountered certain "line boring problems"

that were preventing it from achieving the contractual "tolerances on the alignment" of the

"bores" of 0.001"/ft.  (Bouchard Aff. ¶ 41 & Ex. 25 (May 23, 2010 email) at 1)  Bouchard

attributes the problems to "temperature changes" in internal parts of the turbine, explaining that

---

[4]  Bouchard has submitted an affidavit in which he now states that, "contrary to GE's assertions with respect to GE's self-serving letter dated March 11, 2010, I never agreed that work could be fully completed by May 31, 2010. . . . The letter certainly does not accurately reflect SBIW's position as to this matter."  (Bouchard Aff. ¶ 45) (emphasis in original)

SCE personnel had removed a "Pressure Relief Valve," thereby permitting cool air to enter the turbine's "powerhouse" from outside.  (Id. ¶ 41 &, Ex. 25 (May 28, 2010 email))  Bouchard also blames "missing and broken" concrete at "the bottom portion of the [turbine's] spiral case [which] compromis[ed] the integrity of the unit."  (Id. ¶ 41(d))  Finally, Bouchard asserts that "[c]hanges in the lake level caused movement of the concrete structure of the turbine and directly caused movement in the upper and lower liner plates . . . further prevent[ing] [Plaintiff] from meeting its contractual tolerance of 0.001"/ft."  (Id. ¶ 41(e); see id., Ex. 29 (Bouchard June 4, 2010 Ltr.) at 1 (telling Mackey that "[w]e are measuring movement of 0.003" up and down consistently.  It seems that the movement is caused by the change of the lake level."))

Because of these issues, Michael Lozier, SBIW's chief machinist, asked GE field engineer Mackey to agree to modify the tolerances required in the parties' agreement, asserting that attaining a tolerance of 0.001"/ft would not be feasible.  (Id. ¶ 42; see id. Ex. 27 (Lozier Dep.) at 108 (testifying that he told Mackey that "you've got to open up the tolerance a little bit [for] us"))  GE refused to relax the contractually-required tolerances.  (Id.)

On June 2, 2010, GE's Mann sent Bouchard a letter asserting that SBIW was in default because of its failure to complete the project by the agreed-upon date of May 31, 2010.[5] (Mann Aff., Ex. 6 (June 2, 2010 Ltr.))  Mann states that the letter "serves as GE's Notice of Default to SBIW under Article 13 (e), Sections (a), (b), and (d).  SBIW should immediately contact GE to discuss this matter in-depth."  (Id. at 2)

In response, SBIW sent a series of letters to GE arguing that it was entitled to an extension of time based on the challenges it faced in attempting to achieve tolerances of 0.001"/ft, and asserting that the problems SBIW was dealing with were beyond its control.  (See,

---

[5]  Mann noted that "completion is not expected to be less than 8 weeks from today."  (Mann Aff., Ex. 6 (June 2, 2010 Ltr.))

e.g., Mann Aff., Ex. 8 (June 11, 2010 Ltr. from Bouchard to Mann) (asserting that SBIW was "confronted [by] an uncontrollable force" necessitating an extension of the contract period)) SBIW contended that it was entitled to an additional seventeen working days because of problems it was facing that were "inherent to this powerhouse and [were] totally abnormal to hydroelectric plants." (Id., Ex. 7 (June 4, 2010 Ltr. at 1-2)) Plaintiff also requested a "contract price adjustment," asserting that it had "incurred tremendous cost overruns" in trying to fix the problems it was encountering in its work on the turbine. (Id. at 2) In a June 11, 2010 letter, however, SBIW concedes that it had caused some of the delay. (Mann Aff., Ex. 8 (June 11, 2010 Ltr.) at 1 ("SBIW acknowledge[s] that we have caused some delays when we had the problem with the welding of the liner plates. This issue was addressed back at the end of February and was part of the mutual agreement that SBIW would do everything possible to complete the project by May 31st."))

On June 12, 2010, SBIW submitted a proposed work schedule to GE indicating that SBIW would complete its work on the turbine by August 6, 2010. (Def. R. 56.1 Stmt. ¶ 27; Mann Aff, Ex. 9 at GE-MANN-00242-245) That same day, Mann sent Bouchard a letter terminating the SSA and instructing SBIW to "stop all work on the project," because "[t]o date, SBIW, Inc. has not cured the default." (Def. R. 56.1 Stmt. ¶ 28; Mann Aff., Ex. 10 (Notice of Termination) at GE_SBIW-01002)

As of the date of termination – June 12, 2010 – SBIW had completed "nearly 80% of the project." (Def. R. 56.1 Stmt. ¶ 28; Id., Ex. E (Pltf. Resp. to Def. Contention Interrogatories, No. 7)). GE claims that it has paid SBIW for the work it had completed prior to the termination date, but has not paid SBIW for the remaining unfulfilled purchase orders. (Def. 56.1 Stmt. ¶¶ 30-31; Mann Aff. ¶¶ 30-31) SBIW denies that it has been paid for the work that it

9

completed prior to termination, and contends that "at the time of termination, GE owed SBIW $581,736.00 on the base contract, [and] $515,262.84 for change order work."  (Pltf. Resp. to Def. R. 56.1 Stmt. ¶¶ 30-31; Bouchard Aff. ¶ 59)

After GE terminated its relationship with SBIW, it hired Canyon Hydro ("Canyon") – one of SBIW's competitors — to finish the turbine refurbishment.  (Def. R. 56.1 Stmt. ¶ 44)  The main task to be completed was the "line boring" work on the turbine.  (Id.) Canyon began work at the site on June 17, 2010.  (Bouchard Aff. ¶ 60 & Ex. 41 (Canyon Invoice))  Canyon completed the line boring work on July 31, 2010, although SCE relaxed the tolerance of 0.001"/ft that SBIW had been required to achieve to 0.005"/ft.  (Id. ¶ 60 & Ex. 42 (New Dep.) at 96)

## DISCUSSION

## I.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).

A court deciding a summary judgment motion must "'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for

summary judgment. . . .[M]ere conclusory allegations or denials . . . cannot by themselves create

a genuine issue of material fact where none would otherwise exist.'" <u>Hicks v. Baines</u>, 593 F.3d

159, 166 (2d Cir. 2010) (alterations in original) (quoting <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451,

1456 (2d Cir. 1995)).

## II.   **BREACH OF CONTRACT CLAIM**

GE argues that it is entitled to summary judgment on SBIW's breach of contract

claim, because it is undisputed that SBIW did not substantially perform the SSA by May 31,

2010 – the modified deadline GE claims that SBIW agreed to on March 11, 2010.  (Def. Moving

Br. 10)  GE also argues that SBIW was not entitled to any additional time to complete the

project, because it did not request an extension of time in accordance with the procedures set

forth in the SSA and in the purchase orders.  (<u>Id.</u> at 12-14)  Accordingly, GE argues, it properly

terminated the SSA for cause.  (<u>Id.</u>)  SBIW argues, however, that it never agreed to complete its

work by May 31, 2010, and that, in any event, it had substantially performed by May 31, 2010.

(Pltf. Opp. Br. 4-5, 9-11)  SBIW further argues that GE terminated the SSA "for convenience,"

and should be required to pay SBIW "for all of the work SBIW performed plus termination

costs."  (<u>Id.</u> at 6)

### A.   **Applicable Law**

New York law governs the SSA.  (SSA ¶ 11(a))  "Under New York law, 'an

action for breach of contract requires proof of (1) a contract; (2) performance of the contract by

one party; (3) breach by the other party; and (4) damages.'" <u>Bear, Stearns Funding, Inc. v.

Interface Group-Nevada, Inc.</u>, 361 F. Supp. 2d 283, 290 (S.D.N.Y. 2005) (quoting <u>First

Investors. Corp. v. Liberty Mut. Ins. Co.</u>, 152 F.3d 162, 168 (2d Cir. 1998)).  "In a breach of

contract action, '[i]n order for [a party] to prevail on its summary judgment motion, it must be

clear at the outset that there are no genuine issues of material fact that either [the party] did not breach an agreement, or if it did, that its breach does not rise to the appropriate level of materiality to justify termination of the agreement.'" Drapkin v. Mafco Consol. Grp., Inc., 818 F. Supp. 2d 678, 685-86 (S.D.N.Y. 2011) (quoting Bear, Stearns Funding, 361 F. Supp. 2d at 291).

"'[A] written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed.'" Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J., Nos. 08 Civ. 7069 (KMK), 08 Civ.– 11107 (KMK), 2009 WL 1154094, at *5 (S.D.N.Y. Mar. 19, 2009) (quoting Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000)). "Typically, the best evidence of intent is the contract itself; if an agreement is 'complete, clear and unambiguous on its face[, it] must be enforced according to the plain meaning of its terms.'" Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) (quoting Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002)). Accordingly, where a "'contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.'" RJE Corp. v. Northville Indus. Corp., 329 F.3d 310, 314 (2d Cir. 2003) (quoting De Luca v. De Luca, 300 A.D.2d 342, 342 (2d Dept. 2002)).

"If the contract is ambiguous, extrinsic evidence may be considered 'to ascertain the correct and intended meaning of a term' or terms." Eternity Global Master Fund Ltd., 375 F.3d at 177-78 (quoting Greenfield, 98 N.Y.2d at 569). The Second Circuit has instructed that

> "ambiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." World Trade Ctr. Props., LLC v. Hartford Fire Ins. Co., 345 F.3d 154, 184 (2d Cir.2003) (internal quotation marks omitted). "Whether or not a

writing is ambiguous is a question of law to be resolved by the courts." W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (1990).

Eternity Global Master Fund Ltd., 375 F.3d at 178.

"Where there are alternative, reasonable constructions of a contract, i.e., the contract is ambiguous, the issue 'should be submitted to the trier of fact.'" K. Bell & Assocs. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996) (quoting Consarc Corp. v. Marine Midland Bank., N.A., 996 F.2d 568, 573 (2d Cir. 1993)); see also Haber v. St. Paul Guardian Ins. Co., 137 F.3d 691, 695 (2d Cir. 1998) ("Language in a[] . . . contract will be deemed ambiguous if reasonable minds could differ as to its meaning."); State v. Home Indem. Co., 66 N.Y.2d 669, 671 (1985) (per curiam) ("If . . . the language in the . . . contract is ambiguous and susceptible of two reasonable interpretations, the parties may submit extrinsic evidence as an aid in construction, and the resolution of the ambiguity is for the trier of fact."). However, "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir.1989). "Thus, the court should not find the contract ambiguous where the interpretation urged by one party would 'strain [ ] the contract language beyond its reasonable and ordinary meaning.'" Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010) (quoting Bethlehem Steel Co. v. Turner Constr. Co., 2 N.Y.2d 456, 459 (1957)).

"A fundamental principle of contract law provides that the material breach of a contract by one party discharges the contractual obligations of the non-breaching party." Bear, Stearns Funding, 361 F. Supp. 2d at 291 (citing In re Lavigne, 114 F.3d 379, 387 (2d Cir. 1997); Medinol Ltd. v. Boston Scientific Corp., 346 F. Supp. 2d 575, 618 (S.D.N.Y. 2004); Restatement (Second) of Contracts § 237 (1981)). "[A] breach is not material, and the aggrieved party is not

13

excused from performance of its obligations, if the breaching party has substantially performed his end of the contract."  Barbagallo v. Marcum LLP, 925 F. Supp 2d 275, 287 (E.D.N.Y. 2013); see also F. Garofalo Elec. Co., Inc. v. N.Y. Univ., 300 A.D.2d 186, 188-89 (1st Dept. 2002) (holding that "[i]f [plaintiff] substantially performed its contractual obligations, then it would be entitled to the payment due under the contract less the cost of any correction of defects in its performance," even if it breached the contract).

> Several factors bear on whether a party has substantially performed under a contract, including "the ratio of the performance already rendered to that unperformed, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the performance."

CSC Recovery Corp. v. Daido Steel Co., Ltd., No. 94 Civ. 9214 (LAP), 2000 WL 134578, *6 (S.D.N.Y. Feb. 4, 2000) (quoting Hadden v. Consolidated Edison Co. of New York, Inc., 34 N.Y.2d 88, 96 (1974)).  "The issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain." Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 186-87 (citing Anderson Clayton & Co. v. Alanthus Corp., 91 A.D.2d 985 (2d Dep't 1983)).

**B.**     **Analysis**

    **1.**     **Deadline for Completion of Work**

      Under the SSA, GE is entitled to terminate the agreement if SBIW "fails to perform within the time specified herein or any written extension granted by [Defendant]." (SSA ¶ 13(e))  GE argues that the parties agreed that SBIW was required to complete its work by May 31, 2010.  (Def. Moving Br. 10)  SBIW argues that, under the SSA, it was not required to complete its work until September 1, 2010.  (Pltf. Opp. Br. 10; Bouchard Aff. ¶ 45)  SBIW's arguments are not persuasive.

14

It is undisputed that under the terms of the SSA at the time of execution, SBIW was required to complete its work on the turbine by March 1, 2010.  (Mann Aff. ¶ 9; Bouchard Aff. ¶ 10; <u>see</u> Proposal at GE_SBIW-02300 (listing the final date of work as March 1, 2010)) SBIW asserts, however, that SCE issued a number of change orders in February 2010 that caused SBIW to ask GE for additional time to complete the project.  (Bouchard Aff. ¶¶ 29-31)  SBIW's requests for more time culminated in a March 11, 2010 conference call with GE managers.  After the call, Marc Aoun, GE's project manager, sent Bouchard a letter that purported to summarize what the parties had agreed to during the call.  (Mann Aff., Ex. 5 (Mar. 11, 2010 Ltr.) at 1)  In relevant part, the letter states:

> we understand that you have today agreed to execute the remaining work with the necessary resources, over two shifts for the remainder of the project, in order to achieve completion and return the machine to proper production and to SCE on May 31st 2010 at the latest.

(<u>Id.</u>)

SBIW argues that Aoun misrepresented the substance of the parties' conference call, and that SBIW never agreed to complete the project by May 31, 2010.  (Pltf. Opp. Br. at 10; <u>see</u> <u>also</u> Bouchard Aff ¶ 45 ("contrary to GE's assertions with respect to GE's self-serving letter dated March 11, 2010, I never agreed that work could be fully completed by May 31, 2010") However, Bouchard admitted at his deposition that SBIW had agreed on the March 11, 2010 conference call to complete its work by Mary 31, 2010 "at the latest":

> Q.  Now this letter on March 11th, 2010 says "We understand that you have today agreed to execute the remaining work with the necessary resources over two shifts for the remainder of the project, in order to achieve completion and return the machine to proper production and to SCE on May 31st, 2010, at the latest."  Is that an accurate statement?
>
> A.  Yes

15

Q.  Had you at that point in time agreed to execute the remaining work with the necessary resources over two shifts for the remainder of the project, in order to achieve completion and return the machine to proper production and to SCE on May 31st, 2010 at the latest?

A.  Yes.

(Def. R. 56.1 Stmt., Ex. A (Bouchard Dep.) at 242-43)

In an affidavit submitted in opposition to GE's summary judgment motion, Bouchard now asserts that the March 11, 2010 letter "refers only to GE's understanding and their position regarding our conversation," and that Aoun's letter "certainly does not accurately reflect SBIW's position as to this matter."  (Bouchard Aff. ¶ 45) (emphasis in original)  This statement flatly contradicts Bouchard's deposition testimony, however, and cannot be relied on by SBIW to create a material issue of fact.  See Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."); Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."); Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.").

Moreover, the circumstances surrounding GE's March 11 letter, and other evidence in the record, confirm that it accurately portrays the parties' agreement that SBIW's work on the project will be completed by May 31, 2010.  First, if Bouchard believed that Aoun had misrepresented the parties' agreement to a May 31, 2010 completion date, it is likely that he

16

would have responded to Aoun's March 11 letter.  The fact that Bouchard did not object at that time to Aoun's account on this critical point is persuasive evidence that he agreed with it.  See Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd., 262 F. Supp. 2d 251, 259 (S.D.N.Y. 2003) (noting that if two parties "are engaged in such a relationship that the recipient of a written statement would have been expected to take issue with the contents if he or she disagreed with them, adoption [of the statement] may be established); see also 30B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure Evidence, § 7021 (2d Ed.) ("If a[] . . . written statement is communicated by another person to a party in the litigation containing assertions of fact which if untrue the party would under all the circumstances naturally be expected to deny, his failure to speak is receivable against him as an adoptive admission. . . .").

Second, all of the purchase orders associated with the turbine refurbishment project provide for delivery dates on or before May 31, 2010.  Indeed, 28 of the 29 purchase orders have a delivery date of March 31, 2010, or earlier.  (See Hess Cert. ¶ 5, & Ex. 1-22, 24-29)  The remaining purchase order has a delivery date of May 30, 2010, and relates to SBIW's demobilization activities.  (See id. ¶ 6 & Ex. 23 (purchase order with May 30, 2010 delivery date stating that it is for "Demobilization.  Upon full completion of the project."))

Finally, SBIW's argument that – under the SSA – "it had until September 1, 2010 to complete the work on the project" (Pltf. Resp. to Def. R. 56.1 Stmt. ¶ 12) is not persuasive.  Plaintiff relies on paragraph 2 of the SSA, which states that "[t]he term of this Agreement . . . shall . . . end on **September 1, 2010** ("Expiration Date"), unless sooner terminated as provided below."  (Bouchard Aff., Ex. 13 (SSA), at ¶ 2) (emphasis in original)  This provision clearly relates to the term of the SSA, and not to the date by which SBIW is required to complete its work on the turbine.  Indeed, SBIW does not dispute that the SSA – at the time of execution –

provided that SBIW's work on the turbine had to be completed within 210 days, or by March 1, 2010.  (Pltf. Resp. to Def. R. 56.1 Stmt. ¶ 10; Bouchard Aff. ¶¶ 9-10)

The Court concludes as a matter of law that the parties agreed that SBIW would complete its work on the turbine by May 31, 2010.[6]

### 2.    SBIW's Right to an Extension of Time

SBIW argues that it was entitled to an extension of the completion date because GE and SCE repeatedly changed work requirements, and because of other problems with the project that were beyond its control.  (Pltf. Opp. Br. 11-12; Pltf. Resp. to Def. R. 56.1 Stmt. ¶ 22 & Bouchard Aff., Ex. 29-30)  GE argues that SBIW was not entitled to an extension of time beyond May 31, 2010, to complete the project, because it did not request any extension of time under the procedures set forth in the SSA and purchase orders.  (Def. Moving Br. 12-14; Reply 4-6)

The SSA and the purchase orders set forth procedures for SBIW to follow in the event that it wanted an adjustment of the work schedule.  Paragraph 1 of the SSA provides that "[i]f any changes cause an increase or decrease in the cost of, or the time required for the performance of, any work under the [SSA], . . . [a]ny . . . claim [by Plaintiff] for an adjustment must be asserted within ten (10) days of Seller's receipt of the change notification, and must be approved in a written amendment ('Change Order')."  (Bouchard Aff., Ex. 13 (SSA), at ¶ 1) Each purchase order states that "[a]ny Seller claim for adjustment [of a purchase order] will be deemed waived unless asserted within thirty (30) days from Seller's receipt of the change or suspension notification, and may only include reasonable, direct costs that will necessarily be

---

[6]  Even if the Court found the record ambiguous as to whether the parties agreed to a May 31, 2010 completion date, the default date would be the SSA's original completion date of March 1, 2010 – about which there is no dispute.  See Pltf. Resp. to Def. R. 56.1. Stmt. ¶ 10; Bouchard Aff. ¶¶ 9-10)

incurred as a direct result of the change."  (Mann Aff., Ex. 4, Cl. 6, at GE_SBIW-02341)  Notice

provisions of this sort are routinely enforced under New York law.  See, e.g., F. Garofalo Elec.

Co., Inc. v. New York Univ., 270 A.D.2d 76, 80 (1st Dept. 2000) ("The contract's notice and

documentation requirements for extra work and delay damages are condition precedents to

plaintiff's recovery and the failure to strictly comply is deemed a waiver of such claims.").

       SBIW does not deny that the notice provisions in the SSA and purchase orders are

enforceable, but instead argues that it "made . . . requests for time extensions between March 31,

2010, and June 2, 2010."  (Pltf. Resp. to Def. 56.1 Stmt. ¶ 22 (citing Bouchard Aff., Ex. 29-30))

SBIW offers no credible evidentiary support for this assertion, however.  For example, SBIW

cites to a June 4, 2010 letter from Bouchard to Mackey requesting that an additional seventeen

days be added to the contractual work schedule.  (Bouchard Aff., Ex. 29, at 1)  This letter was

sent after GE had sent a Notice of Default to SBIW on June 2, 2010.  (See Mann Aff., Ex. 6

(June 2, 2010 Ltr.))  Accordingly, this request for additional time is clearly not consistent with

the procedures set forth in the SSA and purchase orders.

       SBIW also cites to a number of emails between Bouchard and Mann in which

they discuss SCE's changes to the project.  Bouchard does not request additional time in these

emails, however.  Indeed, the last email from Bouchard in this exhibit, sent on April 20, 2010,

states that SBIW has already "overcome all the problems" related to SCE's change orders.

(Bouchard Aff., Ex. 30, at P00316)  Moreover, these emails all relate to changes that SCE

allegedly made to SBIW's scope of work in February 2010 – well before March 11, 2010, when

SBIW agreed to complete its work on the turbine by May 31, 2010.  (See id. (Bouchard stating

that changes in the scope of SBIW's work "should have been brought up a long time ago . . . at

least when we started having problems with the welding of the liner plates back in February."

(emphasis added)))  Given that SBIW was aware of SCE's change orders when it agreed to complete the job by May 31, 2010, it cannot now be heard to complain that it should have been given additional time beyond May 31, 2010.  See, e.g., Comprehensive Bldg. Contractors Inc. v. Pollard Excavating Inc., 251 A.D.2d 951, 952 (3d Dept. 1998) (affirming grant of summary judgment where "the record reveals that the problems were foreseeable at the time the contract was negotiated"); see also Kel Kim Corp. v. Cent. Markets, Inc., 70 N.Y.2d 900, 902 (1987) ("[T]he impossibility [of performance] must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract.").

Drawing all inferences in favor of SBIW, it was not entitled to an extension past May 31, 2010 to complete the project.

### 3.      Substantial Completion

SBIW has not demonstrated that there is a material issue of fact as to whether its work on the turbine was substantially complete by May 31, 2010.  Indeed, SBIW admits that it had performed less than 80% of its work on the turbine by then (Def. R. 56.1 Stmt., Ex. E (Pltf. Resp. to Def. Contention Interrogatories, No. 7 (admitting that SBIW had completed "nearly 80% of the project" by May 31, 2010))), and that the turbine was not functional as of May 31, 2010.  (See Specification at 2-1 (noting that "[i]t is [SCE's] intent [that this] major overhaul [will] return the unit back to service. . . .""))

While "[t]he issue of whether a party has substantially performed is usually a question of fact," Merrill Lynch, 500 F.3d at 186, it may be resolved as a matter of law where, as here, the subject of the contracted work remains clearly unusable for its intended purpose.  See Jerry B. Wilson Roofing & Painting, Inc. v. Jobco-E.R. Kelly Assocs., Inc., 128 A.D.2d 953, 954 (3d Dept. 1987) (noting that "[s]ubstantial performance connotes performance that is in

compliance with the contract except for minor and relatively unimportant deviations" (citation omitted)); Sear-Brown Assocs., P.C. v. Blackwatch Dev. Corp., 112 A.D.2d 765, 765 (4th Dept. 1985) ("The fact that plaintiff allocated . . . 13% of the contract price for the remaining work indicates that" it had not substantially performed the contract); Cramer v. Esswein, 220 A.D. 10, 11 (2d Dept. 1927) ("The evidence shows that plaintiff did not substantially perform his contract. Although the contract required that he install eight radiators, he installed only seven, leaving the bathroom without any provision for heat.").

In this case, it is undisputed that SBIW left undone 20% of the work that it was responsible for under the SSA. This is not substantial performance, but instead constitutes a material breach of the SSA. Given that it committed a material breach, SBIW is not entitled to recover the full contract price. See Barbagallo, 925 F. Supp. 2d at 287 ("Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach."). SBIW is, however, entitled to be paid for work reflected in purchase orders that it did complete. See Metro. Switch Bd. Mfg. Co., Inc. v. B & G Elec. Contractors, Div. of B & G Indus., Inc., 96 A.D.3d 725, 726 (2d Dept. 2012) (noting that breaching party is nevertheless entitled to "the unpaid balance of what was due to it under the contract" at the time of its breach).

Here, the parties dispute whether GE has paid SBIW for all of the purchase orders that it completed work on as of the date of termination. (Compare Def. R. 56.1 Stmt. ¶¶ 30-31; Mann Aff. ¶¶ 30-31 with Pltf. Resp. to Def. R. 56.1 Stmt. ¶¶ 30-31; Bouchard Aff. ¶ 59) Moreover, there is not adequate evidence in the record to permit this Court to make a determination as to whether GE has paid SBIW for this work.

Accordingly, GE will be granted summary judgment on Plaintiff's first cause of action, except on the issue of whether it has paid SBIW for all work SBIW performed in connection with purchase orders prior to GE's June 12, 2010 termination of the SSA.

## III.   GE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CONVERSION CLAIM

SBIW's Second Claim for Relief is for conversion, based on the allegation that GE provided to Canyon SBIW's proprietary and confidential materials related to procedures for line boring the turbine.[7]  (Cmplt. ¶¶ 12-15)

### A.    Applicable Law

Under New York law, to state a claim for conversion, a plaintiff must show that "someone, intentionally and without authority, assume[d] or exercise[d] control over personal property belonging to someone else, interfering with that person's right of possession."  Colavito v. N.Y. Organ Donor Network, Inc., 8 N.Y.3d 43, 49-50 (2006); accord Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 403-04 (2d Cir. 2006) (holding that where defendant retained possession of, and deprived plaintiff access to, Plaintiff's business records, a claim for conversion was properly stated).  "A plaintiff must show:  (1) a 'possessory right or interest in the property; and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights.'"  Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp,

---

[7]  In its opposition brief, SBIW argues that its Second Claim for Relief, for conversion, "constitute[s] [an] independent breach[] of contract [claim]."  (Pltf. Opp. Br. at 8; see also id. ("The Second Claim for Relief essentially is a breach of the provision of the [SSA] stemming from GE's failure to preserve the proprietary and confidential nature of SBIW's materials and documentation following termination. . . .")  SBIW's Second Claim for Relief cannot be read as a breach of contract claim, however, because SBIW cannot allege a new cause of action in its brief that was not pled in its complaint.  See Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998) (noting that a party may not raise a new claim in response to a dispositive motion); Beckman v. U.S. Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) (noting that "it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment").

LLC, 813 F. Supp. 2d 489, 535 (S.D.N.Y. 2011) (quoting Colavito, 8 N.Y.3d at 49-50). "A plaintiff's right of possession may be infringed by a wrongful: (i) taking; (ii) detention; or (iii) disposal." Corporacion Fruticola De Chincha v. Watermelon Depot, Inc., No. 05 Civ. 6293 (KNF), 2008 WL 2986276, at *4 (S.D.N.Y. July 31, 2008). "An essential element of conversion is 'unauthorized dominion' to the exclusion of the rights of the plaintiff." Pure Power Boot Camp, 813 F. Supp. 2d at 535.

**B.**   **Analysis**

SBIW's conversion claim fails for multiple reasons.

SBIW argues that its conversion claim is based

essentially [on] a breach of [the confidentiality] provision of the [SSA] stemming from GE's failure to preserve the proprietary and confidential nature of SBIW's materials and documentation following termination. . . .

(Pltf. Opp. Br. 8) In connection with this argument, SBIW claims that "Article 5 [of the SSA], prepared and signed by GE . . . specifically acknowledges that [SBIW's] information and documentation is proprietary and confidential." (Id. at 7)

As an initial matter, "Article 5" of the SSA protects only GE's confidential information; it provides no protection whatsoever to SBIW's information and documents.[8]

---

[8]  Section 5 of the SSA – entitled " Confidentiality and Intellectual Property Rights and Personal Data Provided to Seller." – states:

(a) Confidentiality. Seller and all Seller Personnel shall maintain in confidence and safeguard all information provided or obtained from [Buyer]. Seller recognizes and acknowledges the confidential and proprietary nature of any such information and acknowledges the irreparable harm that could result to Buyer if it is disclosed to a third party, or used for unauthorized purposes, without Buyer's prior written consent. Seller agrees to use any Buyer information only for conducting business with Buyer in a manner contemplated by this Agreement. Seller will take all reasonable steps to preserve Buyer's information in confidence and prevent disclosure to third parties. Seller shall restrict disclosures of any Buyer information to only those Seller's Personnel who have a need to know and shall bind such Personnel to obligations of

Second, even if GE had breached "Article 5" of the SSA, "an action for conversion cannot be predicated on a breach of contract." <u>Corporacion Fruticola De Chincha</u>, 2008 WL 2986276, at *4. A breach of contract can be accompanied by conversion, but "'only where the contract creates a relation out of which springs a duty, independent of the contract obligation, and that independent duty is also violated.'" <u>Id.</u> (quoting <u>Luxonomv Cars, Inc. v.</u>

_____

confidentiality consistent with this Agreement. Upon completion or termination of this Agreement or upon request of the Buyer, Seller shall promptly return all materials incorporating any such Proprietary Information and any copies thereof.

Notwithstanding the foregoing, the parties agree that Seller's obligations with respect to handling, disclosing, reproducing and using such Buyer information are not applicable to any portion(s) of the information which: (1) is in the public domain before receipt by Seller or after the date of receipt without breach of this Agreement by Seller; (2) is known, as evidenced by documentation, to Seller before disclosure by Buyer; (3) is disclosed with Buyer's prior written approval; or (4) is disclosed without restriction to Seller by a third party having a bona fide right to do so without breach of this Agreement by Seller; provided that, for purposes of the provisions of this Section, information shall not be deemed to be available to the public or known to Seller merely because it may be embraced by a more general disclosure or derived from combinations of disclosures generally available to the public or known to Seller.

(b) <u>Publicity</u>. In addition to the other confidentiality obligations under this Agreement, Seller shall not make any announcement, take or release any photographs (except for its internal operation purposes for performing the Services and creating the Deliverables) or release any information concerning this Agreement or any part thereof or with respect to its business relationship with Buyer, to any member of the public, press, business entity or any official body except as required by applicable law, rule, injunction or administrative order, unless prior written consent is obtained from Buyer. If Seller determines it is obligated by law or a governmental authority to make any such announcement or release, Seller shall promptly notify Buyer and cooperate with Buyer to ensure that suitable confidentiality obligations are afforded such information.

(c) <u>System Monitoring</u>. Seller agrees that Buyer may, at any time, without further consent, access and monitor any usage by Seller or its Personnel of any Buyer information, systems and resources, including without limitation: computers, computer software, electronic mail, online services, voicemail, facsimile machines, telephones and photocopiers.

(SSA ¶ 5(a)-(c)) As noted earlier, "Seller" in the SSA refers to SBIW, while "Buyer" refers to GE. (Bouchard Aff., Ex. 13 (SSA))

Citibank, N.A., 65 A.D.2d 549, 550 (2d Dept. 1978)).  SBIW has not alleged that GE violated

any "independent duty" in allegedly turning over SBIW's alleged proprietary information to

Canyon.

Third, SBIW has not demonstrated that GE deprived it of the use of its property –

an essential element of a claim for conversion.  See Geo Grp., Inc. v. Cmty. First Servs., Inc.,

No. 11 Civ. 1711 (CBA), 2012 WL 1077846, at *9 (E.D.N.Y. Mar. 30, 2012) ("Because it

cannot allege that [Defendants] excluded [Plaintiff] from possession or use of the information –

at least not in any but the most abstract sense – [Plaintiff] cannot state a claim for conversion.").

Finally, SBIW has not proffered sufficient evidence to demonstrate that GE ever

provided Canyon with SBIW's procedures for line boring the turbine.  In his affidavit, Bouchard

claims that Brett Bauer, a Canyon vice president, told him that Canyon was given access to

SBIW's line boring procedure.  (Bouchard Aff. ¶ 63)  However, according to Bouchard, Bauer

told him that "SCE instructed Canyon regarding the line-boring machine design and the work

procedure, based upon the proprietary and confidential materials that SBIW had turned over to

GE and SCE."  (Id.)  The Bauer conversation cited by Bouchard concerns SCE, not GE.

In any event, there is no evidence that Bauer has personal knowledge of the

turbine project that is at issue in this case.  Richard New, the president of Canyon, was involved

in the project and in the line boring aspect of the job in particular.  (See Def. R. 56.1 Stmt., Ex. D

(New Dep.) at 13-20)  New testified that Canyon did not utilize any of SBIW's information in

completing the line boring project; indeed, New testified that he "didn't even know" that SBIW

had prepared a written line boring procedure.  (See id. at 15, 19-20)  In short, SBIW has not

established that GE or Canyon ever made use of line boring information obtained from SBIW.

25

For all these reasons, GE is entitled to summary judgment on SBIW's conversion claim.

## CONCLUSION

Defendant's motion for summary judgment on the Complaint's First Claim for Relief is granted, except as to the issue of whether Defendant has paid Plaintiff for all work performed – prior to termination – on purchase orders issued by Defendant.  Defendant's motion for summary judgment on the Complaint's Second Claim for Relief is granted.  The Clerk of the Court is directed to terminate the motion (Dkt. No. 32).

The parties are directed to comply with this Court's Individual Rules concerning the preparation of a pre-trial order.  The joint pre-trial order will be filed on October 24, 2013.  Motions in limine, voir dire requests, and requests to charge are due on October 24, 2013.  Responsive papers, if any, are due on November 4, 2013.  Trial on whether GE paid SBIW for all work performed prior to termination, and on GE's counterclaim, will commence on November 18, 2013, at 9:00 a.m., in Courtroom 705 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York.

Dated:  New York, New York
          September 24, 2013

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

26